**In re ADLER COLEMAN CLEARING CORP., Debtor.**

**Bankruptcy No. 95–08203.**

United States Bankruptcy Court,
S.D. New York.

May 8, 1996.

Cleary, Gottlieb, Steen & Hamilton, New York City, for SIPC Trustee.

Kenneth J. Caputo, Washington, DC, for Securities Investor Protection Corporation.

*MEMORANDUM DECISION ON TRUSTEE'S MOTION FOR ORDER UPHOLDING TRUSTEE'S DETERMINATIONS DENYING CERTAIN CUSTOMER CLAIMS FOR MARKET LOSSES AND EXPUNGING OBJECTIONS WITH RESPECT TO THOSE DETERMINATIONS AND ON TRUSTEE'S MOTION FOR ORDER UPHOLDING TRUSTEE'S DETERMINATIONS DENYING CERTAIN CUSTOMER CLAIMS FOR LOSSES DUE TO ALLEGED FAILURE TO EXECUTE CUSTOMER ORDERS AND EXPUNGING OBJECTIONS WITH RESPECT TO THOSE DETERMINATIONS*

JAMES L. GARRITY, Jr., Bankruptcy Judge.

In this Securities Investor Protection Act ("SIPA") liquidation proceeding, and in ac-

cordance with the procedures established by our March 10, 1995 order (the "March Order"), Edwin B. Mishkin, Esq., as Trustee ("Trustee") for the liquidation of Adler, Coleman Clearing Corp. ("debtor"), denied alleged preferred SIPA claims filed by the Market Loss and Failure To Sell Claimants (as those terms are defined below). Certain of those claimants objected to these determinations and by separate motions the Trustee seeks orders upholding his findings and expunging those objections. Several customers oppose the motions and the Securities Investor Protection Corp. ("SIPC") supports them. For the reasons stated herein, the motions are granted.[1]

### Background

Congress enacted SIPA in response to customer losses that resulted from the failure of broker-dealers in 1969 and 1970. *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. 880, 886 (D.N.J.1988). In doing so, it sought to restore investor confidence in the securities markets and avoid a domino effect involving solvent brokers that had substantial open transactions with firms that had failed. *SIPC v. Barbour,* 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975); *Barton v. SIPC,* 182 B.R. 981, 984 (Bankr.D.N.J.1995). Thus, SIPA is intended:

> to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss.

S.Rep. No. 1218, 91st Cong., 2d Sess. at 4 (1970). In this respect, the protection offered customers under SIPA is akin to that provided to bank depositors by the Federal Deposit Insurance Corporation. *Barton v. SIPC,* 182 B.R. at 984 (citing *SEC v. Aberdeen Securities Co., Inc.,* 480 F.2d 1121, 1123 (3d Cir.), *cert. denied sub nom. Seligsohn v. SEC,* 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973)); *In re MV Securities, Inc.,* 48

B.R. 156, 160 (Bankr.S.D.N.Y.1985) (quoting *SEC v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867, 871 (S.D.N.Y.1974)).

SIPC is a non-profit corporation whose members include most interstate broker-dealers. SIPA establishes SIPC and, among other things, sets forth the procedures for liquidating financially troubled SIPC members. A broker or dealer automatically becomes a member of SIPC upon registration as a broker or dealer with the Securities and Exchange Commission ("SEC") under § 15(b) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78ccc(a)(2)(A). SIPC initiates a SIPA liquidation by filing an application for a customer protective decree in federal district court. 15 U.S.C. § 78eee(a)(3).

SIPA protects customers of registered broker-dealers who have entrusted those broker-dealers with cash or securities in the ordinary course of business. *Matter of Oberweis Securities, Inc.,* 135 B.R. 842, 845 (Bankr.N.D.Ill.1991). For these purposes, a "customer" is

> any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of is business as a broker or dealer from or for the securities accounts of such person for safekeeping, with collateral security, or for purposes of effecting a transfer. The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions of such securities, an any person who has deposited cash with the debtor for the purpose of purchasing securities....

15 U.S.C. § 78lll(2). *See In re Omni Mutual, Inc.,* 193 B.R. 678, 681 (S.D.N.Y.1996). Notwithstanding the special protection afforded customers under SIPA, a SIPA liquidation is essentially a bankruptcy liquidation tailored to achieve the special purposes of SIPA. *See* 15 U.S.C. § 78fff(b) (to the extent consistent with SIPA, a liquidation "shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3 and 5 and subchapters I and II

---

1. Our subject matter jurisdiction of these motions and the parties thereto is predicated on SIPA, 15 U.S.C. §§ 78aaa et seq., and by virtue

of the referral and removal of this case to this court in accordance with 15 U.S.C. § 78eee(b)(4).

of chapter 7 of the Bankruptcy Code"). *See also SIPC v. Ambassador Church Finance/Development Group, Inc.,* 788 F.2d 1208, 1210 (6th Cir.) (district court erred in its award of post-petition interest to customers for period during which SIPC withheld funds while unsuccessfully challenging their status as customers; SIPA liquidation akin to proceeding under chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Code and under bankruptcy law a court cannot award post-petition interest against the debtor's estate absent a surplus), *cert. denied sub nom. Pine Street Baptist Church v. SIPC,* 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986); *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. at 886 (SIPA liquidation akin to proceeding under chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Code). Thus, SIPA liquidations generally involve customer claims and claims of general unsecured creditors, which are satisfied out of a customer estate and general estate, respectively. The customer estate—which is not available to satisfy the claims of general unsecured creditors—is a fund consisting of customer-related assets. *See* 15 U.S.C. § 78*lll*(4). It is distributed pro-rata among customers. *See* 15 U.S.C. § 78fff–2(c)(1).

A SIPA trustee discharges a debtor's obligations to customers to the extent that they may be determined to the trustee's satisfaction from the debtor's books and records. 15 U.S.C. § 78fff–2(b). SIPC advances funds to the trustee—limited to $500,000 per customer of which no more than $100,000 may be based on a customer claim to cash, as opposed to securities—as necessary to enable him to satisfy customer claims, within the limits of SIPA protection, and becomes subrogated to customer claims paid to the extent of advances. *See* 15 U.S.C. §§ 78fff–3(a), 78fff–2(c)(1), 78*lll* (11). *See also Matter of Oberweis Securities, Inc.,* 135 B.R. at 845 (SIPC only advances funds to the extent that the broker's assets are insufficient to satisfy obligations to clients; SIPC's exposure is limited to allowable SIPA claims up to $500,-000 per customer of which no more than $100,000 may represent reimbursement of cash); *In re MV Securities, Inc.,* 48 B.R. at 159 (same). Those advances are repaid from funds in the general estate prior to payment on account of general unsecured claims. 15 U.S.C. § 78fff–3(a).

The value of a customer's account, or its "net equity", is the measure of the preferred SIPA customer claim. "Net equity" is the dollar amount of the customer's account or accounts, to be determined by—

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer (other than customer name securities reclaimed by such customer); minus

(B) any indebtedness of such customer to the debtor on the filing date; plus

(C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff–2(a) of this title) . . . .

15 U.S.C. § 78*lll* (11). A customer's account is valued as of the date the SIPA liquidation is commenced. 15 U.S.C. § 78fff–2(b). *See, e.g., SIPC v. Vigman,* 803 F.2d 1513, 1516 (9th Cir.1986) (claimant's net equity equivalent to amount that broker would have owed claimant had it liquidated holdings on the date SIPC filed protective decree, less outstanding debt owed by claimant to debtor). *See also SEC v. Aberdeen Securities Co., Inc.,* 480 F.2d at 1123–24 (SIPA customer account valued as of the filing date); *Matter of Atkeison,* 446 F.Supp. 844, 847 (M.D.Tenn. 1977) (in determining what securities are owed to customer, trustee must examine books and records of debtor as of filing date); *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. at 892 ("When distributing securities to customers in satisfaction of net equity claims, 'all securities shall be valued as of the close of business on the filing date.'") (quoting 15 U.S.C. § 78fff–2(b)). For these purposes, "accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers." 15 U.S.C. § 78*lll* (11).

*Facts*

On February 27, 1995 (the "Filing Date"), the Honorable Loretta A. Preska, United States District Court, Southern District of New York, entered an order pursuant to the provisions of SIPA § 5(b) appointing the Trustee for liquidation of the debtor's business and removing the liquidation proceedings to this court. Debtor was a member of SIPC and a broker-dealer registered with the Securities and Exchange Commission ("SEC"). It acted primarily as a clearing firm serving approximately 42 introducing firms on a fully disclosed basis and handled approximately 61,000 active customer accounts. As of the Filing Date, those accounts were frozen and the customers could not trade in, or otherwise access, their accounts. Between March 18 and April 26, 1995, the Trustee transferred all but approximately 1,500 customer accounts to third parties thereby permitting those customers whose accounts were transferred to recommence normal trading activities in each such account. The Trustee retained most of the 1,500 remaining accounts to investigate allegations of unauthorized trading and other fraudulent activity in connection with them, all of which were introduced by a broker named Hanover Sterling & Company, Ltd. Several hundred of those accounts were transferred on December 22, 1995.

Pursuant to the March Order we established procedures governing the filing of claims by customers against debtor and the Trustee's review, analysis, liquidation and payment thereof. Among other things, that order directed each person holding a claim against the debtor for customer property to file his claim by September 22, 1995. The order also directed the Trustee to review each such claim to determine whether all or any portion thereof is entitled to preferential treatment as a SIPA customer claim. Where the Trustee believed that customer claim status was appropriate, the order directed him to calculate the customer's net equity and notify the claimant of that determination by letter. The order mandated that any customer who objected to the Trustee's SIPA claim determination file a written objection setting forth in detail the basis for his objection within 30 days of the date of the determination.

Approximately 19,767 claims were timely filed and the Trustee has reviewed them. He disputes approximately 6,000 of them and has issued letters stating the basis of his determination of those claims. Certain letters were directed to customers seeking preferred customer claim status for market losses suffered during the liquidation (the "Market Loss Claimants"). Others were sent to customers seeking to recover losses occasioned by their brokers' alleged failure to execute sell orders issued prior to the commencement of this case (the "Failure To Sell Claimants"). As of March 18, 1996, approximately 465 objections to those determinations had been filed.

The objections filed by 14 Market Loss Claimants and 17 Failure to Sell Claimants (collectively, the "Claimants") are the subject of the Trustee's motions. Those Claimants are:

Market Loss Claimants

| Name | Account No. | Docket No. |
|---|---|---|
| ( 1) Michael L. Barnes, Sr. | 38-000249 | 194 |
| ( 2) Janny R. Barnes | 38-000248 | 193 |
| ( 3) Edward Bekian | 37-006535 | 100 |
| ( 4) Gerald R. Gargiulo | 38-001725 | 498 |
| ( 5) Mearl R. Guthrie | 37-004001 | 119 |
| ( 6) Leo Hausman | 39-003201 | 135 |
| ( 7) Donald L. Hefner | 37-004889 | 644 |
| ( 8) Harry Kranepool. | 32-400734 | 112 |
| ( 9) Ellis & Evoline McLean | 82-495880 | 111 |
| (10) Real A. Rouillard | 38-003944 | 214 |
| (11) Raymond G. Sonnenburg | 32-400297 | 90 |
| (12) Richard J. Weghorn | 78-160240 | 645 |
| (13) Edward & Evelyn Whitcomb | 82-508840 | 138 |
| (14) Stanley Wronowski, Jr. | 37-012454 | 249 |

Failure To Sell Claimants

| Name | Account No. | Docket No. |
| --- | --- | --- |
| ( 1) Eric Bittman | 38-00043-8 | 425 |
| ( 2) Joel & Elaine Brody | 38-000584 | 190 |
| ( 3) Larry Bucsek | 38-00705-3 | 469 |
| ( 4) Wayne Fowler | 37-00307-6 | 204 |
| ( 5) Peter Ganzenmueller | 37-00393-4 | 207 |
| ( 6) Thomas Huemann | 39-00096-2 | 647 |
| ( 7) Bernard Kraft | 37-00617-8 | 153 |
| ( 8) Herbert Krouk | 38-00609-2 | 189 |
| ( 9) Cy LaManna | 82-51199-0 | 137 |
| (10) R.J. Lazarus | | |
| F.B. O'Regan | 38-00282-3 | 625 |
| (11) Cynthia Mandracchia | 38-00306-9 | 517 |
| (12) Everett McCrary | 61-11234-0 | 318 |
| | 39-00130-1 | |
| (13) William Meyers | 39-00305-9 | 460 |
| (14) F. Joseph Paradiso | 37-00849-9 | 499 |
| (15) Ivan & Gertrude Roth | 37-00956-5 | 646 |
| (16) Joseph Stuedle | 61-11204-2 | 221 |
| (17) John Upperco | 37-01165-5 | 155 |

Seven Market Loss Claimants and nine Failure To Sell Claimants failed to appear to contest the relevant motion.[2] Pursuant to the terms of the March Order, they are deemed to be bound by the Trustee's determination of their SIPA customer claims. By consent, the hearing on the objection to the Trustee's calculation of the SIPA claims of Market Loss Claimants Michael L. Barnes, Sr., Janny R. Barnes, Harry Kranepool and Real A. Rouillard was adjourned. By consent, and prior to considering the merits of the claimants' respective responses to the Trustee's objections, the SIPA customer claims asserted by Failure to Sell Claimants Peter Ganzenmueller and John Upperco were converted to general creditor claims against the debtor's general estate, without prejudice to the Trustee's right to object to them.

As of the Filing Date, each Claimant had securities and/or cash in his or her account.

The Trustee has turned over the contents of each account to the respective Claimant. The Trustee contends that in doing so, he has fully satisfied each Claimant's SIPA customer claim. No Claimant disputes the Trustee's factual determination of the cash credit or debit amount in his account, even where the Trustee's determination differed from the amount asserted in such Claimant's original claim form.

The Market Loss Claimants argue that their SIPA customer claims include compensation for losses in the value of the securities in their accounts occasioned by market fluctuations during the period the were denied access to their accounts; i.e. the period between the Filing Date and the date the account was transferred. The Failure to Sell Claimants allege that because the securities in their accounts on the Filing Date should

2. Those Market Loss Claimants are:
(1) Mearl R. Guthrie
(2) Leo Hausman
(3) Donald L. Hefner
(4) Ellis and Evoline McLean
(5) Raymond G. Sonnenburg
(6) Richard J. Weghorn
(7) Stanley Wronowski, Jr.
    Those Failure To Sell Claimants are:

(1) Wayne Fowler
(2) Thomas Huemann
(3) Bernard Kraft
(4) Herbert Krouk
(5) R.J. Lazarus and F.B. O'Regan
(6) Cynthia Mandracchia
(7) F. Joseph Paradiso
(8) Ivan and Gertrude Roth
(9) Joseph Stuedle

have been sold prior to that date, they are entitled to recover, as part of their net equity, the cash proceeds which would have been generated by such a sale and which they allege should have been in their accounts. Each such claimant alleges that he instructed the introducing broker to make the sale, but that the order was not executed. Most allege that they gave the sales instruction by telephone, although some produced to the Trustee copies of documents purporting to be letters or facsimile transmissions containing sales instructions to their introducing brokers. Debtor did not act as an introducing broker for any Claimant. Rather, by contract, each such Claimant's introducing broker cleared or processed its transactions through debtor. Thus, when a customer wished to purchase or sell securities, he would so advise his introducing broker who, would pass the instructions on to debtor for processing. None of the Failure to Sell Claimants allege receipt of a written sales confirmation from the debtor indicating execution of a sales order. The Trustee's examination of the debtor's records reveals no such confirmations. The Trustee contends that each Failure to Sell Claimant's SIPA customer claim is limited to the amount of cash and securities of the same type and quality as those in their account as of the Filing Date.

*Discussion*

■ SIPC protects customers against those losses occasioned by a broker's liquidation. *See In re Stalvey & Assoc., Inc.,* 750 F.2d 464, 473 (5th Cir.1985) ("Congress believed that the SIPA was only an interim step that would not provide complete protection from losses incurred by the failure of broker dealer firms."). SIPC's role in a SIPA liquidation is limited by statute; it does not attempt to make all customers whole. *In re Brentwood Securities, Inc.,* 925 F.2d 325, 330 (9th Cir.1991) (SIPC "does not comprehensively protect investors from the risk that some deals will go bad or that some securities issuers will behave dishonorably"); *SIPC v. Morgan, Kennedy & Co., Inc.,* 533 F.2d 1314, 1317 n. 4 (2d Cir.) (SIPA not designed to accord full compensation to all injured by brokerage collapse), *cert. denied sub nom. Trustees of the Reading Body Works, Inc. v. SIPC,* 426 U.S. 936, 96 S.Ct.

2650, 49 L.Ed.2d 387 (1976); *SEC v. Packer, Wilbur & Co., Inc.,* 498 F.2d 978, 983 (2d Cir.1974) ("SIPA was not designed to provide full protection to all victims of a brokerage collapse."); *SIPC v. Charisma Securities Corp.,* 371 F.Supp. 894, 899 n. 7 (S.D.N.Y. 1974) (recommending revision of SIPA to more fully apprise public that general contract and fraud claims as well as claims for market losses against brokerage houses are not included in the SIPC insurance umbrella), *aff'd,* 506 F.2d 1191 (2d Cir.1974); *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. at 886 n. 3 ("SIPC's role is carefully delineated, and the corporation does not attempt to make all customers whole"). As noted, a claimant's SIPA customer claim is fixed as of the commencement of the SIPA proceeding. *See* 15 U.S.C. § 78fff-2(b). Consonant with the concept of limited protection, SIPC may not advance funds for claims against the broker that do not fall within the narrow scope of a customer's net equity claim. 15 U.S.C. § 78fff-3(a); 17 C.F.R. Part 300.300.

■ Congress did not include compensation for market losses suffered by a customer during the pendency of a SIPA liquidation proceeding within the definition of net equity. *See* 15 U.S.C. § 78lll (11). Thus, we uphold the Trustee's determination that the Market Loss Claimants are not entitled to recover their alleged market losses as preferred SIPA customer claims. *See SEC v. Albert & Maguire Securities Co., Inc.,* 560 F.2d 569, 572 (3d Cir.1977) (SIPA does not protect against market fluctuation); *SEC v. Aberdeen Securities Co., Inc.,* 480 F.2d at 1124 n. 3 ("The change of values between filing date and the time when the claim is paid is a problem for legislative, not judicial, solution. It should be remembered that before SIPC, customers of troubled brokerage houses might not have realized anything at all on their claims."); *Matter of Bevill, Bresler & Schulman, Inc.,* 83 B.R. at 892 ("By use of a uniform filing date, SIPA is designed to insulate the calculation of net equity claims and distributions made on the basis thereof from market fluctuation."). As explained by one commentator:

[I]n a SIPA liquidation customers are at risk for market loss. Delay can be costly.

The statute is designed to insulate the calculation of net equity claims and the distributions made in respect thereof from market fluctuation. Inasmuch as securities distributed to customers in satisfaction of their respective net equity claims are valued as of the filing date, the *actual* market value of the security delivered to the customer is irrelevant. The distribution of a security of the same class and series of an issuer as the security credited to the customer's account on the filing date is *deemed* to satisfy that customer's claim for that security. Thus, while neither SIPC nor the trustee protects customers against market loss, customers will benefit from market appreciation. The assumption underlying the statute is that the customer is an investor and desires to retain his securities. Accordingly, SIPA works to expose the customer to the same risks and rewards he would enjoy had there been no liquidation. If the market goes up the customer gains, if it goes down he loses. The real risk is that in a sharply declining market customers are denied access to their accounts in order to take corrective investment action. They are, in essence, forced to ride the market out until their securities are delivered to them.... [N]either SIPC nor the trustee protects against market loss. That is beyond the scope of the statute.

4 *Collier on Bankruptcy* ¶ 741.05[1] at 741–47 (Lawrence P. King et al. eds., 15th ed. 1996) (emphasis in original) (footnote omitted). *See* 15 U.S.C. §§ 78fff–2(b) and 78fff–2(c)(1).

■ Gerald J. Gargiulo contends that his loss was compounded by the Trustee's failure timely to transfer his account and that the loss is recoverable as a SIPA customer claim. Gargiulo's account was not transferred until December 22, 1995. He notes that stock of the same type as in his account, Porter McLeod National Retail ("Porter McLeod"), was being distributed to other claimants as early as April 1995. That is irrelevant because the Trustee was vested with control over the customer accounts maintained by debtor, not the securities contained therein. Under SIPA, the trustee's role is to "promptly discharge ... all obli-

gations of the debtor to a customer relating to, or net equity claims based upon, securities or cash ..." 15 U.S.C. § 78fff–2(b). *See also* 15 U.S.C. § 78fff–1(b)(1) (trustee's duty is to deliver securities to or on behalf of customers to the maximum extent practicable in satisfaction of customer claims for securities of the same class and series of an issuer). In other words, the Trustee must promptly deliver customer name securities to the debtor's customers as they are entitled to receive them and to distribute customer property and otherwise satisfy customer net equity claims to the extent provided for in § 78fff. *See* 15 U.S.C. § 78fff(a)(1). "The trustee's role is not that of a substitute broker." *In re Weis Securities, Inc.,* 3 B.C.D. 88, 89 (Bankr. S.D.N.Y.1977). In that case a customer sought recovery for market losses incurred during the pendency of a SIPA liquidation when a tender offer was made for shares in a corporation and the trustee failed to respond to the customer's instruction to respond to the tender offer. *Id.* The court found that SIPA did not require the trustee to do anything other than to liquidate the securities and cash available to the debtor with the protection of *all* customers in view. *Id.* The court found that the trustee discharged his duty appropriately by distributing to the customer his pro rata share of the securities which were specifically identifiable property, and that the customer was not entitled to more under the statute. *Id.* There is no proof that the Trustee breached his duties under 15 U.S.C. §§ 78fff, 78fff–1(b) or 78fff–2(b). Even assuming, *arguendo,* that he did, Gargiulo's claim for damages would be rejected because SIPA does not create a right of action for damages against a SIPA trustee for an alleged failure to satisfy those duties. *See* 15 U.S.C. §§ 78fff, 78fff–1(b), 78fff–2(b). Gargiulo's remedy would have been to move to compel the Trustee to distribute the securities contained in his account. In any event, the focus of this motion is the amount which Gargiulo is entitled to receive as part of his SIPA net-equity claim. The statute is explicit that market losses such as Gargiulo suffered are not part of that claim, *see* 15 U.S.C. § 78*lll* (11), and we therefore overrule his objection. Likewise we overrule the objec-

tion of Edward and Evelyn Whitcomb who contend that they are entitled to recoup their market losses as SIPA customer claims because the Trustee failed to halt all trading in the stocks frozen in their account with debtor they held for the duration of the freeze on debtor's accounts, resulting in an unequal market in their stocks. The Whitcombs' maintain that their losses were increased because investors who did not have accounts with debtor were able to keep trading and limit their losses. SIPA does not authorize the Trustee to halt all trading in a particular stock. The Trustee may only freeze trading in accounts held by the debtor, and such a freeze was instituted. The Whitcombs are receiving 100% of the recovery allowed by SIPA as a preferential customer distribution. Because the alleged market losses are not part of a customer's net-equity under SIPA, *see* 15 U.S.C. § 78*lll* (11), we overrule their objection.

Edward Bekian raised a host of issues in response the Trustee's motion. Fundamentally, Bekian asserts that he is entitled to recover his market loss as part of the net equity in his account. As noted, his SIPA customer claim does not encompass that loss. We do not reach the other matters raised in Bekian's response except that we find they have no bearing on, and are irrelevant to, the market loss issues.

■ For the purposes of his motion, the Trustee assumes the truth of the specific allegations of the Failure to Sell Claimants that brokers failed to execute sales as instructed. Nonetheless those claimants are not entitled preferential treatment on account of those alleged losses. Claims arising from a broker's failure to execute a sell order are general unsecured breach of contract claims, not customer claims entitled to priority under SIPA. *See, e.g., SEC v. JNT Investors, Inc.,* 1979 Fed.Sec.L.Rep. ¶ 96,729, 1978 WL 1137 (S.D.N.Y.1978); *Barton v. SIPC,* 182 B.R. at 985; *In re First State Securities Corp.,* 34 B.R. 492, 496–97 (Bankr.S.D.Fla. 1983). *See also In re Bell & Beckwith,* 124 B.R. 35 (Bankr.N.D.Ohio 1990) (claims predicated on fraudulent conduct of broker not compensable under SIPA); *SEC v. S.J. Salmon & Co., Inc.,* 375 F.Supp. 867

(S.D.N.Y.1974) (investor's recision claim based upon fraudulent inducement not a SIPA customer claim; customer would have to pursue claim against broker as a general unsecured creditor); *SEC v. Howard Lawrence & Co., Inc.,* 1 B.C.D. 577, 579 (Bankr. S.D.N.Y.1975) (SIPA does not protect customer claims based on fraud or breach of contract). The principles developed in these decisions were codified by SIPC in the "Rules Relating to Satisfaction of a 'Claim for Cash' or a 'Claim for Securities'", 17 C.F.R. Part 300.500 to Part 300.503. These rules have been approved by the SEC and by statute are accorded the same force and effect as if promulgated by the SEC. *See* 15 U.S.C. § 78ccc. *See also* H.R.Rep. No. 95–746, 95th Cong., 1st Sess. 25 (1977) (SIPC rules are to be considered legislative rather than interpretive and will have the force and effect of law). The SIPC rules apply where there is a question of whether a particular securities transaction gives rise to a claim for cash or for securities under SIPA. 17 C.F.R. Part 300.500. Rule 502(b) provides that despite a customer's order to sell securities, the customer has a claim for those securities unless (1) the debtor has sent written confirmation of the sale or (2) the securities have become the subject of a completed executory contract for sale. Where, as here, neither condition is satisfied, Rule 502(b) defines these claims as claims for securities and requires the trustee to treat them accordingly.

■ Eric Bittman contends that his net equity claim includes proceeds attributable to unsold securities in his account because the failure to sell those securities resulted from the debtor's insolvency and not from his broker's breach of contract. As support, he cites *SEC v. Howard Lawrence & Co., Inc.* 1 B.C.D. 577. There the court held, among other things, that claims based on a broker's failure to sell a security were general unsecured breach of contract claims, not preferred customer claims, because the failure to comply with the sell order did not result from debtor's insolvency. *Id.* at 579. Bittman distinguishes *Howard Lawrence* because he maintains that debtor's financial failure made it impossible for his introducing broker to execute his sale order. Therefore,

he concludes that his loss flows from debtor's insolvency, and as such can be recovered as a preferred customer claim. Bittman offered no proof to support his thesis and as SIPC notes, every failure to execute ultimately can be tied to a debtor's insolvency because debtor's customer accounts are frozen, and no trading can occur upon the commencement of a SIPA proceeding. Bittman's assertions merely beg the question of what actually caused his broker to fail to execute the trade. Moreover, even assuming, *arguendo,* that the debtor's insolvency prevented Bittman's broker from executing his trade, SIPC Rule 502(b) unambiguously provides that unless a claimant can produce either written confirmation of the sale from the debtor or can demonstrate that the securities were subject of a completed executory contract for sale, the claimant will be deemed to hold a claim for securities, and not a claim for cash. SIPC Rule 502(b); 17 C.F.R. Part 300.502(b). Bittman has not satisfied either of these conditions. The Trustee's determination of his claim must be upheld.

In his written objection William Meyers alleged that he is entitled to the cash proceeds of his securities, not the securities themselves because he instructed his broker to liquidate his holdings and close out his account at the market open on February 24, 1995, and that he had been informed by his broker that such action had been taken. During the hearing on the motion, he argued that he is entitled to receive his stock and the value of certain stock warrants which apparently expired on March 26, 1996, as they existed on January 9, 1996. Meyers contends that the Trustee wrongfully failed to deliver his account to Lieberbaum & Co. as he had indicated he would do. The parties agree that Meyers filed a SIPA claim with the Trustee and that in a letter sent to Meyers in December 1995, the Trustee informed Meyers that he disagreed with his claim and that because there was a debit against his account, Meyers owed the debtor money. The letter may also have made some reference about the transfer of the account to Lieberbaum once the debit was satisfied and if Meyers did not object to treatment of the claim. The parties also agree that by letter dated January 9, 1996, the Trustee advised Meyers that he had collected the debt from funds held in his account and that the account would be transferred to Lieberbaum unless Meyers objected to the Trustee's determination of the claim within thirty days of the date of the letter. Meyers contends that upon receiving the December 1995 letter he called the Trustee and agreed to the transfer to Lieberbaum. Meyers alleges that after receiving the January 9, 1996 letter, and up until approximately January 17, 1996, he telephoned Lieberbaum to inquire as to the status of his account, and each time was informed that his account had not yet been transferred. Concerned that his account had not yet been transferred, and that at the expiration of the thirty day period he might lose his right to contest the Trustee's determination of his claim, he objected to the claim in writing a letter dated January 17, 1996.

The "failure to sell" claim embodied in Meyers' written objection is not compensable from customer funds under SIPA. *See Barton v. SIPC,* 182 B.R. at 985 (claim for damages from brokers' failure execute sale as directed was a general unsecured claim to be satisfied from estate, not customer funds); *In re First State Securities Corp.,* 34 B.R. at 496 (same). *Compare In re Oberweis Securities, Inc.,* 135 B.R. at 846 (claim for damages from brokers' failure to invest money as directed was a general unsecured claim to be satisfied from estate, not customer funds). Under the SIPC Rules, Meyers' claim must be treated as one for securities and not as a claim for cash proceeds because he has submitted no evidence in the form of a written confirmation of sale from debtor or a completed executory contract for the sale of securities which would elevate his claim for the proceeds of his pre-petition sale of the securities in his account from a general unsecured claim to a customer claim. *See* SIPC Rule 502(b), 17 C.F.R. Part 300.502(b). Regarding the decrease in value of his account and the expiration of stock warrants between January 9, 1996, and April 17, 1996, as discussed above, SIPA does not provide any recovery for market losses occasioned during the pendency of the SIPA proceeding. *See* 15 U.S.C. § 78*lll* (11) (definition of net equity

does not encompass market loss); *Matter of Bevill, Bresler & Schulman, Inc.*, 83 B.R. at 892 (uniform filing date instituted to insulate SIPA liquidation from market fluctuation). Accordingly, we uphold the Trustee's determination of his claims and overrule his objections.

Messrs. Brody, Bucsek, LaManna, and McCreary each complain that notwithstanding directions to their respective brokers to sell certain securities, the sales were not executed. None of them produced written sale confirmations from the debtor or otherwise demonstrated that the subject securities have become the subject of completed executory contracts for sale. Thus, based upon the authorities cited above, their claims are not entitled to preferred SIPA customer claim status and their objections are overruled. However, as agreed by the parties during the hearing, our denial of Bucsek's and McCreary's claims are deemed filed as general unsecured claims against debtor, without prejudice to the Trustee's right to object to them. As with all the Failure to Sell Claimants, our rulings herein are without prejudice to their rights under SIPA, or otherwise, to seek redress against, without limitation, the broker(s) who failed to execute the subject sales.

*Conclusion*

Based on the foregoing, the Trustee's motions are granted. The Trustee is directed to serve a copy of this Memorandum Decision on each Claimant whose rights have been adjudicated herein, and to settle an order consistent with all of the foregoing.